1

2

3

4

5

6

7

8                         IN THE UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10   KENNETH R. MOYER,

11                Petitioner,              No. CIV S-03-1719 RRB JFM P

12        vs.

13   RICHARD J. KIRKLAND, et al.,          ORDER AND

14                Respondents.             FINDINGS AND RECOMMENDATIONS

15   _____/

16            Petitioner is a state prisoner proceeding through counsel with an application for a

17   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1994 conviction on

18   charges of murder, with the special circumstance that the murder was for financial gain within

19   the meaning of Cal. Penal Code § 190.2(a)(1).  Petitioner was also convicted of one count of

20   conspiracy to commit murder and insurance fraud, and one count of attempted escape.  (CT 261,

21   357-62, 799-800.)  Petitioner was sentenced to life in prison without the possibility of parole.

22            On November 12, 2004, petitioner filed an amended petition in which he raises

23   two claims:  the trial court committed constitutional error when it failed to instruct on accomplice

24   testimony; and petitioner received ineffective assistance of counsel based on counsel's failure to

25   request an accomplice instruction, counsel's lack of preparation; alcohol abuse; and criminal

26   conduct.

1

Respondent filed an answer on March 11, 2005.  With the answer respondent moved to dismiss on grounds that this action was barred by the statute of limitations.  This motion was denied by the district court on September 29, 2006.

On October 2, 2006, petitioner filed an application for permission to file a late traverse.  On November 7, 2006, the previously-assigned magistrate judge denied petitioner's application and the October 2, 2006 traverse has been disregarded.

On October 10, 2007, petitioner was directed to supplement missing portions of the record.  On October 22 and 24, 2007, petitioner filed additional documents which this court has considered in rendering this opinion.

PROCEDURAL HISTORY

1.  Petitioner appealed his conviction to the California Court of Appeal, Third Appellate District.  (Pet.'s Ex. 13.)  The conviction was affirmed on August 30, 1996.  (Pet.'s Ex. 13.)

2.  On October 8, 1996, petitioner filed a petition for review with the California Supreme Court.  (Pet.'s Ex. 17.)  The petition for review was denied on December 11, 1996.

3.  Petitioner filed a petition for writ of habeas corpus on December 10, 1997 in the El Dorado County Superior Court.  (Pet.'s Ex. 19.)  That petition was denied on February 10, 1998.  (Pet.'s Ex. 22.)

4.  On March 18, 2002, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Third Appellate District.  (Pet.'s Ex. 28.)  That petition was denied without prejudice to filing in the superior court on March 18, 2002.  (Pet.'s Ex. 29.)

5.  Petitioner filed a petition for writ of habeas corpus on June 12, 2002 in the El Dorado County Superior Court.  (Pet.'s Ex. 32.)  That petition was denied on June 28, 2002.  (Pet.'s Ex. 33.)

/////

/////

2

6.  On September 3, 2002, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Third Appellate District.  (Pet.'s Ex. 34.)  That petition was denied on September 12, 2002.  (Pet.'s Ex. 35.)

7.  Petitioner filed a petition for writ of habeas corpus on October 9, 2002, in the California Supreme Court.  (Pet.'s Ex. 36.)  On June 25, 2003, that petition was denied.  (Pet.'s Ex. 38.)

8.  On June 12, 2003, petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  (Pet.'s Ex. 37.)  On June 25, 2003, that petition was denied.  (Pet.'s Ex. 38.)

9.  On July 14, 2003, petitioner filed the instant action in propria persona.  On November 12, 2004, petitioner's counsel filed the instant amended petition.

FACTS[1]

Evidence introduced at trial presented a classic scenario:
Wealthy widow marries unfaithful man who takes financial
advantage of her, leading to her murder.

Courtship and Marriage

[Petitioner] owned and operated a swimming pool business and
baseball card shop in Florida.  [Petitioner] met Crowley in 1983,
when [petitioner's] son was in Crowley's elementary school class.

In 1988 Crowley's husband died in an air crash.  Crowley
received over $700,000 in a legal settlement.  [Petitioner] and
Crowley began dating in 1991.  Although pursuing Crowley,
[petitioner] maintained an ongoing sexual relationship with another
woman.  This other woman kept a record of their sexual liaisons in
a notebook.  These meetings continued during Crowley's and
[petitioner's] marriage and after Crowley's murder.

[Petitioner] and Crowley married in May 1992.  Prior to the
marriage, [petitioner] told a business associate that he was
marrying Crowley with a one year guarantee:  if in a year he was
dissatisfied he would leave the marriage with a million dollars.  He

---

[1]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Moyer, No. 3 Crim. C019477 (August 30, 1996), a copy of which was filed November 8, 2004,  as Exhibit #15.

repeated a variation of this story to various people.  Crowley told friends she decided not to enter into a prenuptial agreement, because she loved and trusted the [petitioner].  Shortly after their marriage, Crowley and [petitioner] moved to California and purchased a home.

Ross

   Not long after the marriage, [petitioner] contacted Ross, a former employee then in prison in Florida.  Previously Ross had helped [petitioner] intimidate problem clients and perceived enemies.  [Petitioner] told Ross about his marriage, describing it as a partnership, not a love match.  [Petitioner] also told Ross he planned to stay married for 6 months to a year, and then he and Crowley would divorce and split the money.

   Other conversations between [petitioner] and Ross followed.  [Petitioner] asked Ross if he could kill someone, and mentioned a news article about a woman who broke her neck after falling from a ladder.  Ross stated he could kill someone.  [Petitioner] and Ross discussed killing Crowley by breaking her neck and staging an accident involving a ladder.  After the killing, Ross would return to Florida and [petitioner] would ensure Ross's financial health.

   [Petitioner] asked Ross when he would be released, and offered to have someone take Ross to the airport to enable him to fly to California for the murder.  Ross told [petitioner] he was hoping for an early release in December 1992.  However, Ross was denied early release.

Financial Maneuvers

   During the five-month duration of their marriage, Crowley deposited approximately $433,000 into joint accounts; [petitioner] contributed nothing.  [Petitioner] withdrew and spent almost $200,000 from these accounts.  [Petitioner] withdrew approximately $150,000 in cash and cashier checks.  One check for $18,000 and another for $42,500 bore the signatures of both [petitioner] and Crowley.  However, a documents expert stated Crowley's signature on the two checks were not authentic.

   In September 1992 [petitioner] and Crowley each took out life insurance policies for $180,000.  The policies required a physical examination.  [Petitioner] was the beneficiary of Crowley's policy.

   Approximately one month later, Crowley telephoned a close friend in Florida.  Crowley asked the friend to check the ownership records of two condominiums [petitioner] said he owned.  Crowley did not tell her friend why she wanted the information.  The friend checked the records and discovered [petitioner] did not own the buildings.

The Murder

On October 26, 1992, Crowley's friend called to tell her about the discrepancy in ownership of the condominium.  [Petitioner] answered the phone and said Crowley was not home.  The friend told [petitioner] about the ownership discrepancy, and [petitioner] acknowledged the buildings were held in someone else's name.

The following day, Crowley took the physical examination required under her insurance policy.  When the exam was completed, the policy on Crowley's life for $180,000 became effective.

That night a passing motorist saw the car ahead of him leave the road and plunge down an embankment.  The motorist found Crowley dead in the driver's seat.  Crowley's face was bruised and covered with dried blood.  Mitch McLees sat semi-conscious in the passenger seat.  When paramedics arrived, they attempted to intubate McLees, who suddenly became alert.  One paramedic opined that McLees was afraid of the tube.  A later examination of McLees found no broken bones or internal injuries, only a scrape near his eyebrow.

An autopsy of Crowley revealed no head trauma, but abrasions on her neck.  The pathologist found Crowley did not die in the car accident, but died of a broken neck.  A bloodstain expert testified the blood on Crowley's face was at least one hour old at the time of the accident.  Several experts testified Crowley was dead for some time before the accident.

According to a forensic pathologist, Crowley's broken neck was unusual, and appeared to be the result of a certain military maneuver.  A marine corps officer testified regarding a "rear stranglehold takedown," a military defense tactic consistent with photos of Crowley's broken neck.  An employee of [petitioner], trained in martial arts, testified [petitioner], approximately 13 years before the murder, asked him how to break a person's neck.  The employee demonstrated a neck breaking technique similar to the rear stranglehold takedown.

Following Crowley's death, [petitioner] told a workman and a friend of Crowley's he had spilled cherry cough syrup on the tiles, and wanted to clean the stains.  Later, [petitioner] had workers scrape the grout from between the tiles.  Tiles from the entryway of Crowley's home were removed and analyzed.  The grout between the tiles was stained with blood.  An expert in DNA typing testified the blood on the tiles was Crowley's blood; it was not [petitioner's] or McLees's blood.

An employee of the subdivision where Crowley and [petitioner] lived discussed Crowley's death with [petitioner].  [Petitioner]

claimed Crowley's children were trying to frame him. [Petitioner] asked the employee to tell the police he had seen Crowley and McLees at a certain intersection at 7:30 p.m. the night of the accident, and that both were in good health. [Petitioner] told the employee he would be "taken care of financially" if he complied. When [petitioner] discovered the employee failed to tell the police he had seen the couple, [petitioner] asked him to retract his previous statement and tell the police he had seen Crowley alive at 7:30 the night of her death.

Mitch McLees

The passenger in the car that fateful night was [petitioner's] employee, Mitch McLees. McLees came west from Florida with [petitioner]. [Petitioner] told McLees he was marrying a fairly wealthy woman and, "We'll see how it works out."

The evening of the murder McLees worked in the couple's garage. [Petitioner] called him to the house, where McLees found [petitioner] standing over Crowley's body. Frightened, [petitioner] told him, "I already killed her" and began planning to conceal the murder with a car accident. As Crowley lay on the bloodied entryway [tiles], [petitioner] told McLees to drive the body somewhere and stage an accident. When McLees refused, [petitioner] threatened to tell the police McLees killed Crowley. [Petitioner] also threatened to harm McLees' daughter and his fiancee. McLees agreed to help [petitioner] out of fear. [Petitioner] placed Crowley in the driver's seat and told McLees to say Crowley had an aneurysm. [Petitioner] also advised McLees to go to the hospital with feigned injuries. McLees complied. McLees started he received no money for his participation.

On cross-examination, McLees admitted lying to police after the accident, but argued he was trying to protect his family. In a prior separate trial, McLees had been convicted of first degree murder of Crowley for financial gain, conspiracy to commit murder and insurance fraud.

McLees's cellmate, William Fernandez, told a different story. Fernandez and McLees spoke often in jail; Fernandez recorded the conversations on paper to help him with his own case. According to Fernandez, McLees told him he had an affair with Crowley. [Petitioner] wanted Crowley dead because Crowley had discovered [petitioner's] infidelities. McLees stated he struck and struggled with Crowley, killing her. In return, [petitioner] gave McLees an $8,000 truck. Fernandez admitted not knowing whether McLees told him the truth or if McLees was engaging in "jailhouse talk." McLees admitted knowing Fernandez in jail, but denied telling him he killed Crowley.

/////

1              Defense Case

2          [Petitioner] did not testify.  Witnesses testified [petitioner]
   appeared well-off prior to his marriage.  Friends of [petitioner]
3          stated Crowley told them she loved [petitioner] and he would help
   her get over her first husband's death.  Other witnesses testified
4          [petitioner's] grief following Crowley['s] death seemed genuine.

5          [Petitioner told several people the evening of the accident
   [petitioner] left to show someone a car he was selling.  Crowley
6          was to drop McLees at home and take some cookies to a friend.
   When Crowley failed to return, [petitioner] began searching for
7          her.  A few days before the accident, Crowley sought treatment for
   back and neck pain and tension headaches.

8

9  (People v. Moyer, slip op. at 2-8.)

10                              ANALYSIS

11  I.  Standards for a Writ of Habeas Corpus

12          Federal habeas corpus relief is not available for any claim decided on the merits in

13  state court proceedings unless the state court's adjudication of the claim:

14          (1) resulted in a decision that was contrary to, or involved an
   unreasonable application of, clearly established Federal law, as
15          determined by the Supreme Court of the United States; or

16          (2) resulted in a decision that was based on an unreasonable
   determination of the facts in light of the evidence presented in the
17          State court proceeding.

18  28 U.S.C. § 2254(d).

19          Under section 2254(d)(1), a state court decision is "contrary to" clearly

20  established United States Supreme Court precedents if it applies a rule that contradicts the

21  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

22  indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

23  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

24  (2000)).

25          Under the  "unreasonable application" clause of section 2254(d)(1), a federal

26  habeas court may grant the writ if the state court identifies the correct governing legal principle

from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")  The court looks to the last reasoned state court decision as the basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

II.  Petitioner's Claims

    A.  Claim One

       Petitioner's first claim is that the trial court committed federal constitutional error, and his defense counsel was incompetent with regard to, the omission of accomplice testimony jury instructions, claiming these errors were prejudicial.  (Am. Pet. At 39-61.)  Petitioner contends that witness Ross and witness McLees were accomplices, as defined by California law, and that the trial court was required to instruct the jury as to how to properly consider accomplice testimony.[2]

       The California Court of Appeal for the Third Appellate District rejected petitioner's accomplice instruction claims on petitioner's direct appeal.  The reasoned opinion stated:

    Ross

    [Petitioner] contends Ross's accomplice status was a question for the jury.  The trial court did not instruct the jury pursuant to CALJIC No. 3.19, which would have asked the jury to determine

---

[2]  Petitioner also included arguments pertaining to a failure to obtain jury instructions governing informants, although petitioner concedes that claim is unexhausted.  (Am. Pet. At 48, n.120.)  Petitioner did not raise such a claim in the instant petition and thus is not addressed herein.

whether, based on a preponderance of the evidence, Ross was an accomplice as defined in Penal Code section 1111.

According to [petitioner], Ross's testimony reveals he was involved in a conspiracy with [petitioner] which led to Crowley's death. Either the conspiracy later widened to include McLees, or Ross and [petitioner] formulated a separate conspiracy. Regardless, [petitioner] argues, "Ross would have been liable for prosecution for conspiracy to commit murder even though he did not assist in carrying out the target offense when it was actually committed." In support [petitioner] cites *Stankewitz, supra*, 51 Cal.3d 72 and *People v Zapien* (1993) 4 Cal.4th 929.

In *Stankewitz*, the Supreme Court found a witness's accomplice role to be a question of fact for the jury. The witness was present when others planned the kidnapping, he obeyed orders to get into the car after the abduction, he knew the principals were armed, he remained in the car with the victim and followed orders to give a false name to the police. (*Stankewitz, supra,* 51 Cal.3d at p. 91.) In *Zapien*, the witness gave the defendant her car keys after he admitted killing the victim. The witness reported the car stolen and claimed she had left the keys in it. (*Zapien, supra*, 4 Cal.4th at pp. 949-950.) In *Zapien*, the court found the accomplice instructions should have been given, but found any error harmless. (*Id.* at p. 981.)

Here, Ross testified that while he was in prison [petitioner] contacted him to become part of a conspiracy to murder Crowley. His former employer told Ross about a newspaper article describing a woman's death in a fall. In [petitioner's] scenario, Ross would fly to California when released from prison. Once ensconced in [petitioner's] residence, Ross would stage an accident in the home in which Crowley would appear to break her neck after falling from a ladder. In return, Ross would receive part of [petitioner's] inheritance from Crowley.

This conspiracy withered on the vine when prison officials denied Ross early parole. Ross's release was delayed until May 1993. Meanwhile, Crowley began probing into [petitioner's] financial dealings, asking a friend to check into property ownership. Crowley and [petitioner] took out insurance policies; Crowley's became operative the day of her death. Unwilling to wait for the unavailable Ross, [petitioner] approached a new hit man: McLees.

Although [petitioner] discussed murdering Crowley with Ross, Ross did not participate in Crowley's eventual murder. There is no evidence Ross became involved with [petitioner] and McLees while they formulated the fake auto accident. Ross learned of the second, successful conspiracy only after Crowley's death.

Unlike the witnesses in *Zapien, supra,* 4 Cal.4th 929 and *Stankewitz, supra*, 51 Cal.3d 72, Ross was unaware of the crime until after it was completed.  Ross took no part in the second conspiracy, and therefore the court did not err in failing to submit the question of Ross's accomplice status to the jury.

McLees

[Petitioner] argues the court erred in failing to instruct that, as a matter of law, McLees was an accomplice.  According to [petitioner], McLees was an accomplice as a matter of law because he was tried and convicted for the same offenses for which [petitioner] was on trial.

However, the fact a witness was prosecuted for the same offense as the [petitioner] does not, by itself, establish the person as an accomplice as a matter of law.  (*People v. Tewksbury* (1976) 15 Cal.3d 953, 960.)  To establish a witness was an accomplice as a matter of law, the record must contain uncontroverted evidence that either the witness aided and abetted the defendant in committing the crime, or was involved in a conspiracy in which that witness harbored the intent to commit the offense.  (*People v. Garceau* (1993) 6 Cal.4th 140, 190; *Stankewitz, supra*, 51 Cal.3d at p. 91.)

Here, McLees testified his participation in the murder consisted of staging the accident after [petitioner] killed Crowley.  According to McLees, he knew nothing of [petitioner's] desire to kill his wife until after the murder.  Moreover, as the People point out, a witness is not an accomplice as a matter of law if the witness testified he did not act with the requisite criminal intent, but acted out of fear.  (*People v. Anderson* (1987) 43 Cal.3d 1104, 1138.)  McLees vigorously and steadfastly asserted he acted both out of fear for the safety of his family and fear of being falsely accused by [petitioner] of Crowley's murder.  Based on the record before us, the court did not err in failing to instruct that, as a matter of law, McLees was an accomplice.

[Petitioner] also argues the evidence of McLees's involvement in Crowley's murder was sufficient to submit the question of whether he was an accomplice to the jury.  The People concede McLees's status was a question of fact for the jury, but argue any error was harmless.

Whenever the testimony given at trial is sufficient to warrant the conclusion that a witness implicating a defendant was an accomplice, the trial court must instruct the jury, *sua sponte*, to determine whether the witness was an accomplice.  The trial court also must instruct the jury, *sua sponte*, that the testimony of the accomplice witness is to be viewed with distrust, and the [petitioner] cannot be convicted on the basis of the accomplice's

testimony unless it is corroborated.  (*Zapien, supra*, 4 Cal.4th at p. 982.)  The court in the present case gave none of these instructions.

[Petitioner] argues such error requires reversal unless the error was harmless beyond a reasonable doubt, citing *Sullivan v. Louisiana* (1993) 508 U.S. ____, [124 L.Ed.2d 182, 113 S.Ct. 2078].  In *Sullivan*, the United States Supreme Court held a constitutionally deficient jury instruction in a criminal case as to the definition of reasonable doubt, was not amenable to harmless error analysis on appeal and would always invalidate a conviction.

In the present case, the court erred in failing to instruct on the corroboration necessary for accomplice testimony.  The court's error did not address the burden of proof or any of the elements necessary to find [petitioner] guilty of the charged offenses.  "The California requirement that accomplice testimony be corroborated is a legislative refinement; it is not a rule included within the traditional concepts of due process."  (*In re R.C.* (1974) 39 Cal.App.3d 887, 893.)  Therefore, the standard enunciated in *Sullivan* is inapplicable.

Instead, as the California Supreme Court instructs, we apply a harmless error analysis.  The failure to instruct on accomplice testimony pursuant to Penal Code section 1111 is harmless where there is sufficient corroborating evidence in the record.  The requisite corroboration may be established entirely by circumstantial evidence.  Such evidence may be slight and entitled to little consideration when viewed in isolation.  (*Zapien, supra*, 4 Cal.4th at p. 982.)  "Corroborating evidence must 'tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged.'"  (*Sully, supra*, 53 Cal.3d at p. 1228, citation omitted.)

There was more than ample corroborating evidence.  The day before the murder [petitioner] inadvertently learned Crowley was investigating his ownership claim to condominiums in Florida.  On the day of her death Crowley's life insurance policy, with [petitioner] as beneficiary, became effective.

Crowley died of a broken neck.  Evidence established the neck break was caused by a "rear stranglehold takedown" maneuver similar to a technique an employee of [petitioner's] taught him.  Crowley's blood stained the tiles of the entryway of the couple's home.

After burying his wife, [petitioner] spent the night of the funeral with his long-time girlfriend.  A few weeks after the murder, [petitioner] attempted to bribe an employee of the subdivision to lie to police.  [Petitioner] offered the employee money to falsely

claim he had seen Crowley alive just prior to the accident.  In an attempt to explain the stains on the tiles, [petitioner] claimed he had spilled cherry cough syrup.  [Petitioner] also attempted to have all the grout removed from the tiles.  While awaiting trial, [petitioner] attempted to escape.  Evidence of [petitioner's] escape attempt supports an inference of consciousness of guilt which may properly be considered as corroborative of an accomplice's testimony.  (*People v. Garrison* (1989) 47 Cal.3d 746, 773.)

Ross testified regarding [petitioner's] earlier, unsuccessful attempt to hire him as a hit man.[3]  [Petitioner] outlined a plan of murdering Crowley by breaking her neck and staging an accident to conceal the murder.

In addition, although the court failed to advise the jury they should view McLees's testimony with distrust, McLees admitted his previous felony convictions.  McLees also admitted lying to police and acknowledged his conviction for Crowley's murder.  The court instructed the jury to consider felony convictions of witnesses in evaluating their credibility.

McLees's testimony was amply corroborated by evidence of [petitioner's] motivation, planning, execution and attempts to conceal the murder of his wife.  We find the court's failure to instruct on accomplice testimony was harmless.[4]

(People v. Moyer, slip op. at 10-16.)

Pursuant to California law, a trial court must <u>sua sponte</u> give jury instructions on the pertinent principles of law regarding accomplice testimony "'whenever the testimony given upon the trial is sufficient to warrant the conclusion upon the part of the jury that a witness implicating a defendant was an accomplice.'"  <u>People v. Bevins</u>, 54 Cal.2d 71, 76 (1960) (quoting

---

[3]  As [petitioner] points out, the testimony of one accomplice cannot corroborate the testimony of another accomplice.  (*People v. Tewksbury, supra*, 15 Cal.3d at p. 958.)  However, as discussed, *supra*, Ross was not an accomplice in Crowley's murder.

[4]  [Petitioner] also argues the court compounded its error by giving CALJIC No. 2.27.  CALJIC No. 2.27 states:  "You should give the testimony of a single witness whatever weight you think it deserves.  However, testimony by one witness which you believe concerning any fact is sufficient for the proof of that fact.  You should carefully review all the evidence upon which the proof of such fact depends."  [Id.]  We disagree.  In *People v. Mincey* (1992) 2 Cal.4th 408, a court erred in omitting accomplice instructions, but did instruct in accordance with CALJIC No. 2.27.  The Supreme Court found the error harmless, since it was not reasonably probable the jury would have reached a more favorable result absent the error.  (*Id.* at pp. 460-461.)  Here, our review of the record reveals sufficient corroborating evidence, and consequently we find no more favorable result would have been reached absent the court's error.

1   People v. Warren, 16 Cal.2d 103, 118 (1940)).  California Penal Code § 1111 defines an

2   accomplice as "one who is liable to prosecution for the identical offense charged against the

3   defendant on trial in the cause in which the testimony of the accomplice is given."  An

4   accomplice includes "all persons concerned in the commission of the offense, whether they

5   directly commit the act constituting the offense or aid and abet in its commission."  People v.

6   Scofield, 17 Cal. App. 3d 1018, 1026 (1971).  Evidence is sufficient to support jury instructions

7   relating to accomplice liability if the jury could reasonably conclude that a witness implicating

8   the defendant is an accomplice.  People v. Gordon, 10 Cal. 3d 460, 470 (1973).  The relevant

9   instructions inform the jury that the testimony of the accomplice witness is to be viewed with

10  distrust and that the defendant cannot be convicted on the basis of the accomplice's testimony

11  unless it is corroborated by other evidence which connects the defendant with the commission of

12  the offense.  People v. Rodrigues, 8 Cal. 4th 1060, 1133 (1994).  See also CALJIC Nos. 3.11

13  (testimony of accomplice must be corroborated); 3.13 (one accomplice may not corroborate

14  another); and 3.18 (testimony of accomplice to be viewed with distrust).

15          A challenge to jury instructions does not generally state a federal constitutional

16  claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456

17  U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  Habeas corpus

18  is unavailable for alleged error in the interpretation or application of state law.  Middleton, 768

19  F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v.

20  Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  However, a "claim of error based upon a

21  right not specifically guaranteed by the Constitution may nonetheless form a ground for federal

22  habeas corpus relief where its impact so infects the entire trial that the resulting conviction

23  violates the defendant's right to due process."  Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir.

24  1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); See also Prantil v. California, 843

25  F.2d 314, 317 (9th Cir. 1988) (To prevail on such a claim petitioner must demonstrate that an

26  erroneous instruction "so infected the entire trial that the resulting conviction violates due

13

1   process.")  The analysis for determining whether a trial is "so infected with unfairness" as to rise

2   to the level of a due process violation is similar to the analysis used in determining, under Brecht

3   v. Abrahamson, 507 U.S. 619, 623 (1993), whether an error had "a substantial and injurious

4   effect" on the outcome.  See Thomas v. Hubbard, 273 F.3d 1164, 1179 (9th Cir. 2001), overruled

5   on other grounds by Payton v. Woodford, 299 F.3d 815, 828 n.11 (9th Cir. 2002).

6          Where, as here, the challenge is a failure to give an instruction, the petitioner's

7   burden is "especially heavy," because "[a]n omission, or an incomplete instruction is less likely

8   to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155

9   (1977).  See also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).  If the court does find

10  constitutional error, the court must also find that the error had a substantial and injurious effect or

11  influence in determining the jury's verdict before granting relief in habeas proceedings.  See

12  Calderon v. Coleman, 525 U.S. 141, 146-47 (1998); Bains v. Cambra, 204 F.3d 964, 977 (9th

13  Cir. 2000).

14         Because a federal court may not issue the writ of habeas corpus on the basis of a

15  perceived error of state law, the issue of whether Ross and McLees were accomplices to the

16  murder of Crowley, as that term is defined by state law, is not cognizable in this habeas corpus

17  proceeding.[5]  Indeed, federal courts have rejected the rule that uncorroborated accomplice

18  ────────────────────

19      [5]  However, this court agrees with the state court's view that Ross was not an accomplice
    to Crowley's murder.  California Penal Code § 1111 defines an accomplice as someone who is

20  liable for the same crime as the defendant.  People v. Martinez, 132 Cal.App.3d 119, 130, 183
    Cal.Rptr. 256 (1982).  A witness is considered an accomplice as a matter of law when undisputed

21  facts are admitted that demonstrate the witness was more likely than not an accomplice.  People
    v. Tewksbury, 15 Cal.3d 953, 967, 127 Cal.Rptr. 135 (1976).  Here, Mr. Ross was not released

22  from prison in Florida until May 14, 1993.  (RT 702.)  Ms. Crowley was murdered on October
    27, 1992, while Mr. Ross was still incarcerated in Florida.  Although Mr. Ross may have been an

23  accomplice to an earlier conspiracy to murder Ms. Crowley at an earlier time, the record makes
    clear that that conspiracy was over once Mr. Ross's bid for early parole was denied.  The fact that

24  the prosecutor argued at McLees' trial that the plan to murder Ms. Crowley had roots in Florida
    (Pl.'s Ex. 7), or that the murder was "a plan originally conceived between Ken Moyer and Ernest

25  Ross" (RT 2720) in petitioner's trial, does not prove Mr. Ross was a part of the events of October
    27, 1992, and does not change the fact that Mr. Ross was in no position to play a role in the plan

26  executed on October 27, 1992.  Rather, the prosecutor's argument bolstered his view that it was
    petitioner's plan and, once it became clear Mr. Ross was not in a position to perpetrate the plan,

testimony is insufficient to uphold a criminal conviction.  United States v. Augenblick, 393 U.S.

348, 352 (1969) ("[w]hen we look at the requirements of procedural due process, the use of

accomplice testimony is not catalogued with constitutional restrictions"); Lisenba v. California,

314 U.S. 219, 227 (1941) ("[t]he Fourteenth Amendment does not forbid a state court to construe

and apply its laws with respect to the evidence of an accomplice"); United States v. Lopez, 803

F. 2d 969, 973 (9th Cir. 1996) (accomplice's uncorroborated testimony is sufficient to sustain a

conviction unless it is incredible or insubstantial on its face); United States v. Necoechea, 986

F.2d 1273, 1282 (9th Cir. 1993) (same); United States v. Turner, 528 F.2d 143, 161 (9th Cir.

1975) ("a conviction may be based on the uncorroborated testimony of an accomplice. . . .").

Under federal law, the fact that testimony may have been given by an untrustworthy witness or

that it was contradicted does not make the testimony itself untrustworthy.  Lopez, 803 F.2d at

973.  "If uncorroborated accomplice testimony is sufficient to support a conviction under the

Constitution, there can be no constitutional right to instruct the jury that it must find

corroboration for an accomplice's testimony."  Takacs v. Engle, 768 F.2d 122, 127 (6th Cir.

1985).

Thus, the state court's failure to sua sponte instruct on accomplice testimony does

not violate federal law unless the testimony was incredible or insubstantial on its face.

Necoechea, 986 F.2d at 1282.  "The Constitution does not prohibit convictions based primarily

on accomplice testimony."  Scrivner v. Tansy, 68 F.3d 1234, 1239 (10th Cir.1995), cert. denied,

516 U.S. 1178 (1996).  Failure to instruct on accomplice corroboration is not a constitutional

error unless it rendered the trial fundamentally unfair.  Boyd v. Ward, 179 F.3d 904, 921-22

(10th Cir. 1999); Foster v. Ward, 182 F.3d 1177, 1193 (10th Cir. 1999), cert. denied, 529 U.S.

1027 (2000).  Corroboration is not constitutionally required.  Laboa v. Calderon, 224 F.3d 972,

---

petitioner looked to McLees for assistance with his plan.  (The same prosecutor prosecuted both
McLees' and petitioner's trials.)  Because it was not error for the state court to find Ross was not
an accomplice, it was not error for the state court to consider Ross' testimony as corroboration in
this case.

979 (9th Cir. 2000).  Habeas relief will lie only if the failure to instruct denied petitioner's right to fundamental fairness because the accomplice testimony was incredible or insubstantial on its face.  Laboa, 224 F.3d at 979.

In addition, petitioner must establish actual prejudice.  Brecht v. Abrahamson, 507 U.S. 619 (1993).  Under the Brecht harmless error analysis, petitioner's alleged constitutional errors warrant a grant of the habeas petition only if "in light of the record as a whole," the error had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 638 (internal quotation marks omitted).  Thus, petitioner is not entitled to habeas relief unless he can establish that the error "resulted in 'actual prejudice.' "  Brecht, 507 U.S. at 637.

As discussed below, the accomplice testimony was neither inherently incredible nor insubstantial on its face, and thus, no federal rights are implicated and petitioner was not arbitrarily deprived of a state law entitlement.  However, to the extent that the trial court's failure to instruct the jury sua sponte on the issue of corroboration pursuant to California law implicates a federal right, the issue is controlled by the deferential standards of the AEDPA.  Under that standard, this court concludes that, even if the errors were cognizable under federal law, they were harmless for the reasons articulated by the state courts.

The record reflects that the testimony of Ernest Ross was neither incredible nor insubstantial on its face.[6]  Furthermore, "state courts are the ultimate expositors of state law," and this court is bound by the state's construction except when it appears that its interpretation is an obvious subterfuge to evade the consideration of a federal issue.  Mullaney v. Wilbur, 421 U.S. 684, 691 (1975).  There is no such subterfuge here, and petitioner does not contend there is.  Therefore this court must accept the state court's interpretation that, under California law, Ernest Ross was not an accomplice to the murder of Susan Crowley.  The court has also reviewed the

/////

---

[6]  Although Ross was able to avoid being charged as an habitual offender in exchange for his testimony here, he was still required to face charges for sale of rock cocaine.  (RT 2853.)

1  record and determined that the admission of the testimony of Ernest Ross did not render

2  petitioner's trial fundamentally unfair.

3          The testimony of McLees presents a closer question.  The state court found

4  it was error based on the trial court's failure to sua sponte instruct the jury on accomplice

5  testimony.  There was sufficient evidence to require the giving of an accomplice instruction

6  under California law.  However, a review of McLees' testimony reflects that his testimony was

7  not incredible or insubstantial on its face.  Indeed, although McLees initially maintained that the

8  victim had died during the auto accident, during McLees' trial, he testified that when he finished

9  painting, he went inside the house and saw petitioner standing over the victim's body (Pet.'s Ex.

10  6:  People v. McLees, C018509 (October 11, 1995) at 3), just as he testified in petitioner's trial.

11  McLees' testimony at his own trial was substantially similar to his testimony at petitioner's trial

12  in that he maintained his sole role was in staging the accident after petitioner killed the victim.

13  (Id.)

14          In addition, the testimony of McLees was corroborated by other evidence.  The

15  evidence demonstrated the victim was killed about one hour prior to the auto accident using a

16  take-down strangle hold maneuver similar to one petitioner's employee had previously taught

17  him to use.  (RT 433-35; 522; 530-36.)  Blood evidence showed the victim's blood in the tiled

18  entryway of petitioner's home.  (RT 1073-88; 1122.)  Evidence showed the victim was murdered

19  on the day the victim had medical tests rendering the new insurance policy effective.[7]

20

21          [7] Allstate Insurance agent Joseph Streepy testified that he met with petitioner concerning insurance needs.  (RT 1260-61.)  Susan came to town September 30 and they completed the

22  application.  (RT 1261.)  The insurance policy on Susan Moyer was for $180,000.  (RT 1261.)
   Certain medical tests were required before the insurance took effect.  (RT 1261.)  "According to

23  our guidelines and underwriting rules, the test had to be completed before we would honor any death claim.  So the tests have to be completed before the insurance goes into effect." (RT

24  1262.)  Susan completed the tests on October 27, 1992, the date of her death.  (RT 1261.)  On cross-examination, petitioner's defense counsel attempted to argue this insurance policy was

25  really a mortgage cancellation policy, but Streepy testified that petitioner rejected home mortgage protection in favor of life insurance.  (RT 1267-68.)  Of course, petitioner would be able to use

26  the proceeds of the policy to pay off the mortgage if he had so chosen.  (RT 1268.)  Finally, J.T. Armstrong, Claim Staff Consultant for Allstate Life Insurance Company, wrote a letter to Joe

1      The victim was murdered the day after petitioner learned the victim had been

2 investigating whether petitioner actually owned two condominiums in Florida.  (RT 387-92.)

3 The victim had participated in discussions concerning the purchase of these condominiums; in

4 early July 1992, petitioner paid a nonrefundable deposit of $30,000.00 to buy the condominiums,

5 but he failed to pay the balance due and title was not transferred.  (RT 195, 199.)  Petitioner and

6 the victim had applied for a mortgage to buy their home in El Dorado Hills, California.  The loan

7 application listed a ranch property and two condominiums in Florida, information that was

8 provided by petitioner, and the victim did not sign the document in the mortgage broker's

9 presence.  (RT 1148-50; 1440-48; 1477-85.)

10      Earl Blackburn testified that Susan Crowley called him on October 22, 1992, and

11 asked him to go to the courthouse and look up the legal description of two condos in The

12 Meadows subdivision.  (RT 387.)  Susan Crowley gave Blackburn the street address, but

13 Blackburn was unable to locate a condo with petitioner's name on it.  (RT 388.)  On October 26,

14 1992, Blackburn phoned the Moyer residence and petitioner answered the phone.  (RT 391.)

15 Blackburn explained who he was and that he had been unable to locate the legal descriptions for

16 the two condos as Ms. Moyer had requested.  (RT 391.)  Petitioner gave Blackburn the condo

17 numbers and explained that they were held in the name of Ben Baxter or Ben Boxer.  (RT 392.)

18 Blackburn informed petitioner he would return to the courthouse and mail the legal descriptions

19 on Tuesday, October 27, 1992.  (RT 392.)

20      On October 27, 1992, about 7:00 p.m., Monte Burtz spoke to petitioner by

21 telephone about painting petitioner needed to have done.  Petitioner mentioned that his wife was

22 on a stepladder putting up a light, that she was in a precarious position and the ladder might fall.

23 /////

24 /////

25

26 Ruzich of the Allstate Claims Department, confirming that there was "$180,000.00 life insurance coverage in effect on the date Ms. Moyer was murdered."  (Pet.'s Ex. 50.)

Petitioner also asked Burtz to have his brother, Charles, come by to do some tile work. (RT 1399-1401.) Further corroboration was provided by the fact that McLees possessed and subsequently sold petitioner's Mercedes van given to McLees by petitioner. (RT 337-42; 2098.)

After the auto accident, petitioner gave various accounts about what he was doing at the time of the accident as well as what his wife had been doing. (RT 644-46; 573.) Petitioner's next door neighbor, Bruce Ramirez, saw petitioner at about 7:40 or 7:45 p.m.; petitioner told him Susan was at Wal-Mart and he had to put dinner on the table. (RT 1595-96.)

The afternoon after the murder, petitioner told Mr. and Mrs. Mallos that his wife had been driving a worker back to Folsom at the time of the accident. Petitioner said he was away seeing a potential buyer for his truck. (RT 1544-51; 1573.) Mrs. Gallender arrived on October 29 to help petitioner; she heard petitioner tell what happened on October 27: his wife cooked chicken and rice. She left to go to Wal-Mart and to take McLees home and to take some cookies to Tommi Black. (RT 1626-28.) Petitioner did not mention going out to sell his van. (RT 1648.) Mrs. Gallender testified she saw some cookies in the kitchen, but did not see any chicken and rice. (RT 1628-29.)

On October 28, petitioner told Jerry Keller, the victim's son-in-law, that Susan was taking McLees home while petitioner was showing his Mercedes van to a potential buyer. Petitioner later mentioned Susan was taking cookies to Tommi Black. (RT 644-46.) Petitioner first told Freda Cushman, on October 30, that Susan was taking McLees home and she went off the road. (RT 570-71.) Petitioner later told Cushman that Susan was going to Wal-Mart and to drop cookies off at her realtor's house. (RT 573.) Petitioner told Steve Coder, the victim's son-in-law, that Susan had been taking McLees back to his motel room and that petitioner had been out trying to sell his truck at that time. (RT 620.) Petitioner told Ginger Ayers that Susan was taking cookies to a friend and dropping off someone and that he had gone to the store to get some salad things. (RT 1056-60.) No cookies were found in the wrecked car.

/////

1       In addition, there was evidence of petitioner's behavior after the murder that

2   suggested consciousness of guilt.  Petitioner attempted to bribe a contractor who worked nearby

3   to tell police that he had seen McLees and the victim driving together just prior to the accident.

4   (RT 825-26, 1402-18, 1426.)  Kenneth Keener testified that the morning after the victim died,

5   petitioner told Keener that his wife "had run off the road and broke her neck."  (RT 1536.)

6   Petitioner attempted to manufacture evidence that the stained grout in his entryway was cherry

7   Nyquil rather than blood.  (RT 1353-55, 1612-14, 1624-25.)  Petitioner had hired a worker to tile

8   the front porch; petitioner was attempting to scrape the grout from between the tiles in the

9   entryway in an apparent attempt to conceal the blood evidence when the worker offered to clear

10  out the grout for him.  (RT 1353-60.)  Petitioner vacuumed up the grout as it was being removed.

11  (Id.)  Patricia McCall testified that after the murder, petitioner sent her $1,000.00 to cover

12  telephone charges incurred by her son, McLees.  (RT 985-93; 995; 1001-02.)  Petitioner also sent

13  McCall $300.00 with a note explaining it was to help McLees with things he needed in jail.  (RT

14  1001-02.)  Finally, while awaiting trial, petitioner attempted to escape.  (RT 2055-60.)

15      On the night of his wife's funeral, petitioner spent the night at a hotel with his

16  long-time mistress, Norma Jean White.  (RT 290-92.)

17      All of this evidence provided corroboration for McLees' testimony at trial as to

18  petitioner's motivation, planning, execution and attempts to conceal the murder of his wife.

19      Corroborative evidence required by Cal. Penal Code § 1111 "need not corroborate

20  every fact to which the accomplice testified or establish the corpus delicti, but is sufficient if it

21  tends to connect the defendant with the crime in such a way as to satisfy the jury that the

22  accomplice is telling the truth."  People v. Fauber, 2 Cal.4th 792, 9 Cal.Rptr.2d 24 (1992).

23  Because all of this evidence meets the standard required under California law, this court cannot

24  find that failure to instruct on accomplice corroboration rendered the trial fundamentally unfair.

25  In addition, when viewing the record "as a whole," this error did not have a "substantial and

26  injurious effect or influence in determining the jury's verdict."  As noted by the state court, the

jury was informed that McLees had been convicted of murdering Crowley, that McLees had a criminal background, and that he had lied numerous times.  (RT 1874-75, 1869-2030, 2047-48.)  The jury was similarly informed concerning Ernest Ross:  they were told of his felony background as well as his willingness to participate in a murder and other crimes of moral turpitude.  (RT 675, 680, 700, 715.)

The jury was also instructed how felony convictions were to be considered in assessing witnesses' credibility.  (RT 2691.)  The jury was instructed that "No person may be convicted of a criminal offense unless there is some proof of each element of the crime independent of any admission made by him outside of this trial."  (RT 2695.)

The jury was also instructed with an aiding and abetting instruction:

> A person aids and abets the commission of a crime when he or she, one, with the knowledge of the unlawful purpose of the perpetrator and, two, with the intent or purpose of committing, encouraging, or facilitating the commission of the crime by act or advice aids, promotes, encourages, or instigates the commission of the crime.

(RT 2697-98.)

> A person who aids and abets the commission of a crime need not be personally present at the scene of the crime.  Mere presence at the scene of a crime which does not itself assist in the commission of the crime does not amount to aiding and abetting.  Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.

(RT 2698.)  The jury was also instructed with the definition of an accomplice (CALJIC 3.10):

> An accomplice is a person who is subject to prosecution for the identical offense charged in Counts I and II against the [petitioner] on trial by reason of aiding and abetting or being a member of a criminal conspiracy.  [¶]  Merely assenting to or aiding or assisting in the commission of a crime without knowledge of the unlawful purpose of the perpetrator and without the intent or purpose of committing, encouraging, or facilitating the commission of the crime is not criminal.  Thus, a person who . . . assents to or aids or assists in the commission of a crime without such knowledge and without such intent or purpose is not an accomplice in the commission of such crime.

1  (RT 2698.)  The jury was instructed as to the crime of conspiracy (RT 2702-03) and was

2  specifically instructed that:

> Evidence of a statement made by one alleged conspirator other than at this trial shall not be considered by you against . . . another alleged conspirator unless you determine, one, that from other independent evidence that at the time the statement was made a conspiracy to commit a crime existed; two, that the statement was made while the person making the statement was participating in the conspiracy, and that the person against whom it was offered was participating in the conspiracy before and during that time; and three, that such statement was made in furtherance of the objective of the conspiracy.

9  (RT 2703-04.)

10        Both McLees and Ross were impeached on cross-examination.  (RT 709-758;

11  1869-2030.)  In closing argument, petitioner's defense counsel emphasized that the credibility

12  instruction was meant for Ross' testimony and reminded the jury of Ross' felony conviction.

13  (RT 2780.)  Defense counsel argued that McLees' lack of memory was remarkable, pointing out

14  that McLees' story changed from the auto accident to McLees' recent story and noting that every

15  time McLees was cross-examined, McLees had "major memory loss."  (RT 2803.)

16        Petitioner's citation to People of Territory of Guam v. Dela Rosa, 644 F.2d 1257

17  (C.A. Guam 1981) is unavailing.  First, the question in Dela Rosa was whether the witness was

18  granted immunity at all and, if so, was the court's failure to give the requested instruction error.

19  Id.  In Dela Rosa, testimony by the key witness was obtained by the prosecution's promise not to

20  prosecute.  Id.  Here, McLees was not only prosecuted, but was found guilty of murder and

21  sentenced to life in prison without the possibility of parole even before petitioner was tried.

22  Petitioner's citation to Freeman is similarly unavailing.  Freeman v. Class, 95 F.3d 639, 641-43

23  (8th Cir. 1996) (the prosecution dropped stolen car charges in exchange for the testimony of a

24  /////

25  /////

26  /////

1    codefendant).  In addition, here, the circumstantial evidence against petitioner was sufficient, as

2    noted above.[8]

3              Petitioner argues that "[h]ad the instructions been given, it is reasonably probable

4    that the jury would have found the evidence to be unreliable and/or inadequately corroborated."

5    (Am. Pet. at 48.)  Yet petitioner fails to support this argument with credible evidence.  Petitioner

6    contends there was no direct evidence linking him to the victim's death other than the

7    accomplice/informant testimony and the "relatively lengthy" jury deliberation period reflected

8    "the jury . . . did not view the case as a slam dunk."[9]  (Am. Pet. At 56.)  Petitioner contends that

9    defense counsel's defense theory that McLees acted alone, when taken in light of McLees'

10   testimony that petitioner committed the murder, means "the absence of accomplice instructions is

11   necessarily prejudicial."  (Am. Pet. at 56, citing Commonwealth v. Chmiel, 639 A.2d 9 (Pa.

12   1994).

13             However, petitioner underestimates the weight of the corroborating evidence

14   discussed above as well as the fact that defense counsel's theory was that McLees acted alone.

15   Unlike defense counsel in Chmiel, who argued two persons were involved in the murder, one of

16   whom was Chmiel, petitioner's defense counsel argued petitioner played no role in the murder.

17   Given defense counsel's defense, it would not be unreasonable to not request an accomplice

18

19             [8]  "Other evidence of Dela Rosa's guilt included the chief criminalist's testimony that the
20   murder weapon, a Bernadelli Model 90, was the same type as that stolen from David Texiera's
     house two months before the murder and Texiera's testimony that Dela Rosa had visited him in
21   January, fired the gun, and asked Texiera if he could have it.  The eyewitness identification
     testimony given by the surviving schoolteacher and by another person who saw a man with the
22   victims shortly before the crimes was inconclusive.  Although both provided general descriptions
     of the suspect that matched the defendant, neither witness was able to pick Dela Rosa from a
23   lineup and the schoolteacher could not pick out Dela Rosa from a photo spread."  Dela Rosa, 644
     F.2d at 1260.

24             [9]  Jury deliberations began around 10:00 a.m. on August 4, 1994.  (CT 514-15.)  The jury
25   deliberated all day August 8, 1994, throughout the day on August 9, 1994, and returned its
     verdict on August 10, 1994.  (CT 516-19.)  Therefore, the jury deliberated over three days.  Jury
26   selection began on June 20, 1994 (RT 49), and closing arguments ended on August 4, 1994 (RT
     2864).

23

1  testimony jury instruction as inconsistent with the defense theory defense counsel pursued at

2  trial.

3              Defense counsel may have attempted to discredit McLees rather than

4  acknowledge to the jury through accomplice instructions that petitioner participated in the

5  murder.  Defense counsel relied heavily on a 'circumstantial evidence' defense; arguing that

6  there was little direct evidence connecting petitioner to the crime other than a few bits of

7  circumstantial evidence.[10]  Defense counsel impeached both Ross and McLees with their criminal

8  convictions and pointed out Ross' testimony was a result of having been "threatened" with

9  longer incarceration if he failed to testify.  (RT 736.)

10             Moreover, McLees, already convicted of murder and sentenced to life in prison

11 without the possibility of parole, had little to gain by testifying against petitioner.  Although

12 petitioner has presented some evidence that the trial judge wrote at least two letters in an effort to

13 have McLees transferred to a prison in Washington near his family, the evidence reflects that

14 McLees was first housed in Los Angeles, then transferred to High Desert State Prison in

15 Susanville.  (Pet.'s Ex. 46-48.)  Prison officials denied the request to transfer McLees out of state

16 while he owed restitution.  (Pet.'s Ex. 48.)  On this record, the court cannot find that further

17 instruction from the judge to distrust the testimony of McLees would have had a meaningful

18 impact on the jury's decision.

19             A rational trier of fact could find that McLees' testimony, combined with the

20 corroborating evidence, as well as the testimony of Ross and Fernandez, provided a sufficient

21 basis for a conviction.  Furthermore, "the credibility of witnesses is a question for the jury,

22 unreviewable on appeal."  United States v. Delgado, 357 F.3d 1061, 1068 (9th Cir.2004).  After

23 review of the record, this court cannot find that the trial court's failure to instruct on accomplice

24
      [10]  Indeed, defense counsel wrote a letter to the trial judge, dated June 30, 1994, in which
25 he stated that his theory of the case was "that rumor, innuendo and ill opinion created most of the
   atmosphere in which [his] client was investigated, and then subsequently charged."  (Pet.'s Ex.
26 9.)

1   testimony rendered petitioner's trial fundamentally unfair or that the failure to so instruct the jury

2   had "a substantial and injurious effect" on the outcome of the trial.

3       B.  Second Claim

4           Petitioner's second claim is that he suffered ineffective assistance of counsel, in

5   violation of the Sixth Amendment, based on defense counsel's failure to request an accomplice

6   instruction, lack of preparation; alcohol abuse; and criminal conduct.  Petitioner argues that these

7   errors rendered defense counsel constructively absent during petitioner's trial, resulting in a

8   complete denial of counsel at a critical state of the proceeding under United States v. Cronic, 466

9   U.S. 648 (1984).

10          The issue here is whether prejudice should be presumed under Cronic, on the

11   basis of structural error, or whether prejudice must be proved under Strickland v. Washington,

12   466 U.S. 668 (1984).

13          In order to prevail on his claim of ineffective assistance of counsel, petitioner

14   must show two things, an unreasonable error and, unless prejudice is presumed, prejudice

15   flowing from that error.  First petitioner must show that, considering all the circumstances,

16   counsel's performance fell below an objective standard of reasonableness.  Strickland v.

17   Washington, 466 U.S. 688 (1984).  The court must determine whether in light of all the

18   circumstances, the identified acts or omissions were outside the wide range of professional

19   competent assistance.  Id. at 690.  "Review of counsel's performance is highly deferential and

20   there is a strong presumption that counsel's conduct fell within the wide range of reasonable

21   representation."  United States v. Ferreira-Alameda, 815 F.2d 1251 (9th Cir. 1986).

22          Then, unless prejudice is presumed, petitioner must prove prejudice.  Strickland at

23   693.  To demonstrate prejudice, petitioner must show that "there is a reasonable probability that,

24   but for counsel's unprofessional errors, the result of the proceeding would have been different."

25   Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the

26   outcome."  Id.  The focus of the prejudice analysis is on "whether counsel's deficient

1  performance renders the result of the trial unreliable or the proceeding fundamentally unfair."

2  Lockhart v. Fretwell, 506 U.S. 364, 372 (1993).

3        Ordinarily, prejudice must be proved, but it is presumed in limited circumstances

4  that are "so likely to prejudice the accused that the cost of litigating their effect in a particular

5  case is unjustified."  See Cronic, 466 U.S. at 658; Strickland, 466 U.S. at 692.  Cronic identified

6  several such situations, including "if counsel entirely fails to subject the prosecution's case to

7  meaningful adversarial testing."  Cronic, 466 U.S. at 659.  Thus, under Cronic, the attorney's

8  failure to test the prosecutor's case must be complete.  Id.

9        Specifically, the Supreme Court has identified three situations in which prejudice

10  may be presumed.  Cronic, 466 U.S. at 659.

11        First and "[m]ost obvious" was the "complete denial of counsel."
[Cronic], at 659, 104 S.Ct. 2039. A trial would be presumptively

12  unfair, we said, where the accused is denied the presence of
counsel at "a critical stage," id., at 659, 662, 104 S.Ct. 2039, a

13  phrase we used  in Hamilton v. Alabama, 368 U.S. 52, 54, 82 S.Ct.
157, 7 L.Ed.2d 114 (1961), and White v. Maryland, 373 U.S. 59,

14  60, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963) (per curiam), to denote a
step of a criminal proceeding, such as arraignment, that held

15  significant consequences for the accused. [Footnote omitted.]
Second, we posited that a similar presumption was warranted if

16  "counsel entirely fails to subject the prosecution's case to
meaningful adversarial testing." Cronic, supra, at 659, 104 S.Ct.

17  2039.  Finally, we said that in cases like Powell v. Alabama, 287
U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), where counsel is called

18  upon to render assistance under circumstances where competent
counsel very likely could not, the defendant need not show that the

19  proceedings were affected. Cronic, supra, at 659-662, 104 S.Ct.
2039.

20

21  Bell v. Cone, 535 U.S. 685, 695-96 (2002).

22        Petitioner challenges the superior court's ruling on this claim as unreasonable

23  because the state court did not consider the claim as a constitutional violation under United

24  States v. Cronic, 466 U.S. 648 (1984) and its failure to employ the standard of review required by

25  Chapman v. California, 386 U.S. 18 (1967).

26  /////

1    However, the record reflects that the same judge who tried petitioner's underlying

2    criminal case also issued a ruling construing petitioner's filing as a writ of mandate framed in the

3    context of ineffective assistance of counsel claims, but including a constitutional challenge based

4    on the failure to request accomplice instructions.  In the Matter of Kenneth Russell Moyer,

5    Action No. PV-003126 (February 10, 1998), attached as Pet.'s Ex. 22.)  The trial judge

6    specifically cited United States v. Cronic and Strickland v. Washington, and properly noted that

7    Cronic's application is limited.  (Pet.'s Ex. 22 at 2.)  The trial judge stated:

> It is noted in passing that the petitioner's counsel was provided
> with a transcript of the trial of People v. Mclees and the Evidence
> Code 402 hearing in so far as it concerned DNA at the Superior
> Court of Napa in People v. Anthony Becerra, Jr. CR 10110 before
> the Hon. W. Scott Snowden.  The issue of DNA testing of the
> blood in People v. Moyer was identical to and involved the same
> blood as People v. Mclees.  After extensive review by counsel, the
> propriety of the CPR was submitted on those transcripts and the
> testimony of the expert.  The assertion of too short of time for
> preparation and improper failure to dispute the DNA is patently
> without merit.
>
> The remaining issues are similarly without merit on their face.
>
> It is noted in passing that the defendant's counsel was provided
> with a transcript of the trial of Mitchell McLees, the Evidence
> Code Section 402 hearing in the McLees case, as well as a
> transcript of the Evidence Code Section 402 hearing insofar as it
> concerned DNA at the Superior Court of California, County of
> Napa, before the Honorable Scott Snowden.  The issue of DNA
> testing of the blood in People v. Moyer was identical to and
> involved the same blood as People v. McLees.  After extensive
> review by counsel, the propriety of CPR use was submitted on
> those transcripts, and the testimony of the expert.  The assertion of
> too short a time for preparation and improper failure to dispute the
> DNA is factually without merit.  The remaining issues raised are
> similarly without merit on their face.[11]

/////

---

[11]  This paragraph is very similar to the first paragraph quoted from the ruling, although the first paragraph finds petitioner's request "patently" without merit and this paragraph finds the request "factually" without merit.  It is unclear whether the trial judge wished to differentiate his ruling in this way or whether one of the paragraphs is a word-processing glitch.  Both paragraphs are included verbatim as provided in the ruling.  (Pet.'s Ex. 22.)  Neither the duplication nor the differentiation makes a difference in this court's findings.

1          <u>Conclusion</u>

2          Although this initially appear[s] close on paper, petitioner has
          failed to establish a prima facie showing any alleged ineffective
3         assistance of counsel so undermined the proper functioning of the
          adversarial process that the trial cannot be relied on as having
4         produced a just result.  <u>Strickland v. Washington</u>, 466 U.S. at p.
          686, 104 S.Ct. at p. 2064.  In addition, petitioner failed to show
5         how specific errors undermined the reliability of the verdict or how
          counsel's performance fell below an objective standard of
6         reasonableness under prevailing professional norms, and there is a
          reasonable probability that, but for counsel's unprofessional errors
7         and/or omissions, the trial would have resulted in a more favorable
          outcome.  <u>United States v. Cronic</u>, 466 U.S. 648, 104 S.Ct. 2039,
8         80 L.Ed.2d 657; <u>In re Avena</u>, supra, 12 Cal.4th 694, 49 Cal.Rptr.2d
          413, 909 P.2d 1017.  <u>People v. Duvall</u> (1995) 9 Cal.4th 464[.]

9
          Lastly, the issue of instructional error was fully addressed and
10        dismissed by the court of appeal.  The fact that petitioner is
          attempting a second bite of the apple is evidenced by the fact that
11        this portion of the writ consists of a photocopy of the appellate
          brief.  As such, petitioner has failed [to meet] any of the four tests
12        set forth in <u>In re Harris</u> (1993) 5 Cal.4th 813.

13         The Writ of Mandate is DENIED.

14  <u>In the Matter of Kenneth Russell Moyer</u>, Action No. PV-003126 (February 10, 1998), attached as

15  Pet.'s Ex. 22.)

16          In the instant case, the state court did not rule contrary to clearly established

17  federal law in declining to presume prejudice.  The court in <u>Cronic</u> stated that "[i]f no actual

18  'Assistance' 'for' the accused's 'defence' is provided, then the constitutional guarantee has been

19  violated."  <u>Cronic</u>, 466 U.S. at 654.  Here, even if the court assumes counsel's performance was

20  deficient, he nevertheless achieved some benefits for petitioner.  As noted by petitioner, defense

21  counsel cross-examined prosecution witnesses, and raised pertinent objections when

22  appropriate.[12]  (Am. Pet. at 65.)  Counsel questioned McLees about his prior felony convictions,

23  /////

24  /////

25  _____

26      [12]  For example, during McLees' testimony he objected when it appeared McLees was
    about to testify about petitioner's alleged bad acts.  (RT 1803-07.)

including the murder of Susan Crowley.[13]  (RT 1929.)  Defense counsel cross-examined McLees about his prior statements to law enforcement that Susan Crowley was alive at the time he was in the car with her.  (RT 2004-05.)  Defense counsel was able to get McLees to admit that was the story McLees was sticking to while McLees was in jail, even up to the time of his own trial for the murder of Susan Crowley.  (RT 2010.)  Counsel cross-examined McLees on the fact that McLees changed his story about what happened the night Susan Crowley was murdered.  (RT 2012-13.)

Defense counsel noted a discrepancy between Ross' testimony at the McLees trial and petitioner's trial concerning the date he would be released from prison in Florida.  (RT 719-20; 727-28.)  Defense counsel elicited Ross' testimony that he had been incarcerated two times for sale of rock cocaine since May of 1993.  (RT 715.)  Defense counsel was able to elicit Ross' statement that his testimony was a result of having been "threatened" with longer incarceration if he failed to testify.  (RT 736.)  Defense counsel was able to clarify on cross-examination that Ross was not charged as a habitual offender on two separate charges based on his testimony first in the McLees case and later in the instant case.  (RT 737-40.)  Defense counsel also impeached Ross' testimony that he was unable to remember by citing portions of Ross' testimony from his earlier testimony at the McLees trial, which took place just prior to petitioner's trial.  (RT 718-19; 721-23; 730-32.)

Defense counsel's closing argument was almost four hours long (RT 2850), recounting the evidence and challenging the credibility of key witnesses Norma Jean White

/////

---

[13]  Petitioner makes much of defense counsel's failure to adduce evidence about McLees' "hopes that he would receive leniency in his case for testifying against Mr. Moyer."  (Am. Pet. at 84, n.180.)  However, as noted above, McLees had already been convicted of first degree murder and sentenced to life without parole.  No leniency had been granted at the time of trial and the trial judge's later attempts to have McLees housed in Washington state were futile.  See p. 24, supra.  Thus, petitioner has failed to demonstrate Strickland prejudice based on defense counsel's failure to adduce this evidence.

1   (RT 2774), Ernest Ross (RT 2779-80), Gary Wells (RT 2783-86), Kenneth Keener (RT 2799-

2   800), and Mitchell McLees (RT 2803-04).

3           Counsel argued that the DNA test results were weak (RT 2791.)  He argued that

4   the prosecution failed to demonstrate that petitioner had taken out the insurance policy with the

5   intent to murder the victim.  (RT 2793.)  He argued that the medical tests were not yet completed

6   or sent to the underwriters, so no binder was in place to make the insurance policy effective on

7   the date of the victim's death.  (RT 2792.)  Counsel argued about the application of the

8   circumstantial evidence jury instructions.  (RT 2817.)

9           Defense counsel also argued that McLees had a love interest in the victim and

10  suggested that McLees had made a pass at the victim and, when she rejected him, lost control and

11  killed her to keep petitioner from finding out.  (RT 2818-19.)  Counsel also focused on his theory

12  that Gary Wells' role in the investigation presented a conflict of interest based on his prior

13  friendship with petitioner, their shared love interests, including Norma Jean White, and the fact

14  that many of the investigators working this case were unaware of Wells' relationship with Norma

15  Jean White even up until petitioner's trial.  (RT 2783-85; 2815; 2833; 2836.)

16          Finally, defense counsel was able to persuade the judge to instruct the jury on

17  voluntary manslaughter based on evidence of a struggle.  (RT 2707-09.)

18          A review of the record reflects that petitioner was not completely or constructively

19  denied benefit of counsel.  Therefore, United States v. Cronic is not controlling.  The state

20  court's ruling was not an unreasonable application of federal law.  See Smith v. Robbins, 528

21  U.S. 259, 286-87 (2000).  The state court found that the evidence provided "supported the court's

22  conclusion that the judge, district attorney, and Schenk's trial assistant believed he ably

23  performed his duties during trial[, citing Exhibits E and F]"[14] and petitioner was unable to "point

24  _____

25      [14]  Exhibit E was the sealed transcript of the March 10, 1998 hearing at which the trial judge informed the prosecution and habeas attorney James S. Clark that trial counsel Schenk had told the trial judge that Schenk "had a pitcher of Margaritas at lunch."  (Id. at 1; [Docket No. 73-

26  5 at 179–87]; see also Pet.'s Ex. 23.)  Exhibit F was the Report of Investigation from David

1  to [any] specific act, strategy, or decision by Schenk which fell below the objective standard of

2  reasonableness." Moyer v. El Dorado County Superior Court, et al., Case No. PR93-3090/PV-

3  003126 (June 28, 2002.) (Attached as Pet.'s Ex. 33.)  Accordingly, this court cannot say that the

4  superior court's refusal to set aside petitioner's sentence under Cronic was objectively

5  unreasonable.  See Strickland v. Washington, 466 U.S. 668 (1984); Yarborough v. Gentry, 540

6  U.S. 1 (2003)(per curiam).

7          The superior court's rejection of petitioner's claim under Cronic was neither

8  contrary to, nor an unreasonable application of, controlling principles of United States Supreme

9  Court precedent.  Petitioner's challenge based on Cronic should be denied.

10          Because this court cannot find that defense counsel failed to subject the

11  prosecution's case to meaningful adversarial testing under Cronic, the court turns now to the

12  analysis required under Strickland.  A court need not determine whether counsel's performance

13  was deficient before examining the prejudice suffered by the petitioner as a result of the alleged

14  deficiencies.  Strickland, 466 U.S. 668, 697 (1984).  Since it is necessary to prove prejudice, any

15  deficiency that does not result in prejudice must necessarily fail.

16          The El Dorado County Superior Court rendered a reasoned opinion addressing the

17  ineffective assistance of counsel claim in its ruling on petitioner's amended petition for writ of

18  habeas corpus.  (Pet.'s Ex. 33, filed November 8, 2004.)  The Superior Court noted that

19  petitioner had failed to timely raise the ineffective assistance of counsel claims:  "The trial

20  occurred in 1992.  Petitioner sat right next to his attorney and never raised any issue regarding his

21  attorney's sobriety." (Id. at 1.)  The Superior Court also noted that petitioner had failed to raise

22  the ineffective assistance of counsel claim in his previous habeas corpus petition.  (Id. at 2.)

23  Ultimately, however, the state court found

24  /////

25  _____

26  Martin to attorney Michael B. Bigelow, dated June 11, 2002.  [Docket No. 73-5 at 189-191; see
   also Pet.'s Ex. 41.]

1        Petitioner's allegations are conclusionary and thus fail to state a
     prima facie case for relief (*People v. Duvall* (1994) 9 Cal.4th 464,
2    474; *In re Swain* (1949) 34 Cal.2d 300, 304).

3        *Strickland v. Washington* (1984) 466 U.S. 668, 687-688 requires
     a showing that (1) counsel's conduct fell below an objective
4    standard of reasonableness, and (2) this incompetence caused
     prejudice to [petitioner].  The available evidence attached to the
5    petition supports the conclusion that the judge, district attorney,
     and Schenk's trial assistant believed he ably performed his duties
6    during trial.  (Exhibits E and F).  Petitioner can point to no specific
     act, strategy, or decision by Schenk which fell below the objective
7    standard of reasonableness.  To claim that prejudice can be
     presumed only demonstrates that the current claim is entirely
8    speculative.

9        The petition for writ of habeas corpus is denied.

10   (Pet.'s Ex. 33, filed November 8, 2004, at 2.)

11       Petitioner contends an evidentiary hearing is required to determine whether

12   petitioner suffered prejudice as a result of defense counsel's ineffective performance.

13   Respondent counters that petitioner has failed to provide a declaration clarifying what

14   information or direction he provided defense counsel or a declaration from defense counsel

15   explaining the actual reasons for his conduct, thus depriving this court of the ability to discern

16   tactical, informed decisions from uninformed decisions.

17       The failure to request accomplice instructions can fall below the range of

18   reasonable assistance expected from defense counsel.  See e.g. United States v. Bosch, 914 F.2d

19   1239, 1247 (9th Cir.1990); United States v. Martin, 489 F.2d 674, 677 (9th Cir.1973), cert.

20   denied, 417 U.S. 948 (1974).  However, the issue that controls is whether the defendant was

21   prejudiced by the attorney's failure to request the instructions.  Id.

22       This court must consider the following factors to determine whether petitioner

23   suffered prejudice:  whether the accomplice's testimony was corroborated, whether the jury was

24   instructed with general credibility instructions, and whether defense counsel questioned the

25   accomplices' credibility during closing argument.  Bosch, 914 F.2d at 1248.  A court can also

26   weigh such additional factors as whether defense counsel attacked the accomplice's credibility

1  during cross-examination or called any witnesses to rebut the accomplice's testimony.  Martin,

2  489 F.2d at 677.

3         As discussed above, this court has found that the accomplice's testimony was

4  corroborated (supra, at 16-19); the jury was instructed with general credibility instructions (supra,

5  at 19-20); defense counsel cross-examined Ross and McLees (supra, at 20), and defense counsel

6  challenged the credibility of McLees and Ross during closing argument (supra, at 26).  After

7  review of the record, this court does not find that petitioner was prejudiced by counsel's failure to

8  request an accomplice testimony jury instruction.

9         The court turns now to petitioner's claims that defense counsel's lack of

10  preparation, alcohol abuse, and criminal conduct rendered defense counsel constructively absent

11  during petitioner's trial.

12         First, the court notes that both the trial judge and prosecutor were unaware of

13  defense counsel's alleged alcohol abuse during the trial.  (Pet.'s Ex. 23.)  After trial, counsel

14  mentioned to the trial judge that he had a pitcher of Margaritas at lunch, and an in camera hearing

15  was held on March 10, 1998, before the trial judge with the prosecutor and petitioner's appellate

16  counsel.  (Pet.'s Ex. 23.)  The trial judge noted on the record that he "never detected it and [he]

17  was close to [defense counsel], as was Judge Finney with whom [he'd] discussed this with, and

18  [he] . . . inquired of all court staff whether they noticed anything that would indicate alcohol

19  abuse.  None of them did."  (Pet.'s Ex. 23 at 2.)  The prosecutor added "I have had dealings with

20  him throughout the time.  I never once smelled alcohol on his breath.  I never once noted any

21  problems with what he was doing.  He was coherent, cohesive throughout the entire trial."

22  (Pet.'s Ex. 23 at 2.)  The trial judge responded, "That was my feeling."  (Id.)  The trial judge

23  confirmed that he did not intend to vacate his order on the writ because he thought defense

24  counsel "did a very good job" and "felt the major points raised by [petitioner] were groundless."

25  (Pet.'s Ex. 23 at 3.)

26  /////

1      After the prosecution noted that petitioner had not raised the issue of alcohol

2 abuse in his habeas petition, the trial judge continued:  "I do not believe it has merit, but I am

3 ethically required to advise you because it could, although not one of the grounds for the alleged

4 incompetence – I think it has to be disclosed at this point."  (Pet.'s Ex. 23 at 4.)

5      In addition, David Martin, a second year law clerk who assisted defense counsel

6 during trial stated that "regardless of Mr. Schenk's drinking habits, he never saw him lo[]se focus

7 during the trial. . . . Mr. Schenk appeared to do well with examining and cross-examining

8 witnesses. . . .  After drinking at lunch, Mr. Schenk may have been a little more boisterous, but

9 had no outward signs of intoxication."  (Pet.'s Ex. 41.)

10      As for defects in preparation, defense counsel, in a letter to appellate counsel

11 noted:

12              I had four months and a lot of pressure from the Judge to get this
                matter done.  In the course of my discovery, in reviewing the
13              10,000 pages of material, the Court was generous to me in
                providing me with funds to assist me in hiring personnel to help
14              get me ready, including a full-time assistant at trial.  The only
                problem is, however, the prosecution made many trips to Florida,
15              at least four or five, and spent several days at a time.  My
                investigators spent a total of maybe a week and had to divide that
16              amongst several states.  You and I both know it would be
                impossible for me to say that preparation would have made a
17              difference in this case, especially in light of the fact that I have
                always found that when one (the defendant) manufactures too
18              many alibis, it doesn't go over well with the jury.  In this particular
                case, the obsessive scraping of the grout, the over blown show of
19              parading carrying Nyquil around the day after the murder, and the
                obvious attempt to draw attention to that fact, along with the
20              request for the alibi to be made by his neighbor was, I believe,
                more than the jury could actually swallow in good conscious.

21

22 (Pet.'s Ex. 43.)  Despite his efforts to obtain a declaration, petitioner has failed to provide a

23 declaration by defense counsel confirming that had he had more time to prepare, a better outcome

24 /////

25 /////

26 /////

34

1  would have been probable.  In light of the above letter, it does not appear such a declaration

2  could be obtained.[15]

3          Counsel's letter and this court's review of the record do not demonstrate that

4  defense counsel failed to prepare for trial.  Defense counsel was an experienced criminal trial

5  lawyer faced with some fairly incriminating actions taken by petitioner even without the

6  testimony of McLees or Ross.  Petitioner has failed to demonstrate that additional preparation

7  would have changed the outcome of the trial.  Indeed, defense counsel here had benefit of

8  something most defense counsel do not:  a trial transcript of another person convicted of killing

9  the victim your client is presently accused of committing.  The trial of McLees was prosecuted by

10  the same prosecutor that tried the instant action.  Thus, a review of McLees trial transcript was

11  particularly helpful to defense counsel.  The trial judge also provided defense counsel with a

12  transcript of a trial in Napa County that dealt with DNA issues present in the instant action, as

13  well as funding to hire additional staff to help.  Petitioner has not demonstrated how additional

14  preparation or more time to engage in preparation would have changed the outcome of this case.

15          While petitioner makes much of defense counsel's failure to consult expert

16  witnesses, petitioner has failed to produce any evidence that demonstrates consulting such

17  experts would have made a difference.  Petitioner has not provided a declaration refuting the

18  DNA testimony given in this case.  Petitioner has not demonstrated how defense counsel's

19  stipulation to summation of the blood evidence on the transcript of the McLees trial caused

20  petitioner prejudice.  Petitioner has not demonstrated that the testing methods used were

21  /////

22

23          [15] Petitioner has provided a declaration of appellate counsel, Marcia C. Levine, that
    defense counsel told her the only issue he could think of as a potential appellate issue would be
24  ineffective assistance of counsel:  "He explained that when he accepted the appointment in the
    case, the trial judge assured him that he would have sufficient time to prepare.  However, his
25  requests for continuances to prepare were denied and he felt he went to trial without adequate
    preparation."  (Pet.'s Ex. 43.)  This statement, without more, does not meet the prejudice prong
26  of Strickland.

1   erroneous or subject to false positives, or that the blood tested actually belonged to someone

2   other than the victim.

3        Petitioner contends that there was evidence that the PCR DNA testing used in this

4   case was a "recent development," that "the use of PCR for forensic purposes [had] been the

5   subject of controversy and debate in both scientific and legal contexts," and that PCR testing is

6   "not as discriminating" as other types of DNA testing.  State v. Moeller, 548 N.W.2d 465, 481

7   (S.D. 1996).  However, petitioner fails to mention that the South Dakota court went on to find

8   that "[h]aving reviewed the trial record, relevant case law, and scientific literature, we conclude

9   that PCR DQ Alpha typing is sufficiently reliable for admission in criminal trials."  Id. at 548

10  N.W.2d 483.

11       Perhaps if the defense had continued to argue that the victim died in the auto

12  accident, attacking the DNA evidence would have been critical.  But, by the time of trial, it was

13  obvious that the victim had been murdered, either by McLees or petitioner or both.  Disputing the

14  blood analysis with expert testimony at this point would have been futile because the blood,

15  while an important piece of corroborating evidence, was not the focal point.

16       Petitioner has not provided a declaration by a handwriting expert confirming that

17  the victim had, in fact, signed the checks the prosecution claimed were forged, or that the checks

18  were signed by someone other than petitioner.  Petitioner has not demonstrated how consulting

19  accounting, insurance or other financial experts would have changed the outcome herein.

20  Petitioner has not presented any evidence diluting the non-insurance-based financial motives

21  uncovered at trial.

22       Petitioner has not provided a declaration from an insurance industry professional

23  confirming that the insurance policy on the victim did not become effective on the date of her

24  death.  Rather, petitioner provided a photocopy of a "Life Claim Worksheet," which has the date

25  11-3-92 written by a line entitled "Policy Issue/Effective Date."  (Pet.'s Ex. 51.)  This document

26  appears to be an unsigned work sheet, hardly compelling evidence, and even lists the wrong date

1   of death for the victim.  (Id.)  Moreover, as respondent points out, the more critical question

2   would be what date petitioner believed the insurance policy became effective.  (Answer, at 24.)

3   Despite petitioner's arguments to the contrary, there was testimony at trial the insurance policy

4   was effective at the date of the victim's death and that petitioner attempted to collect on this

5   insurance policy.  (RT 1305.)

6          Also, J.T. Armstrong, a Claim Staff Consultant with Allstate Life Insurance

7   Company, wrote a letter dated June 15, 1994 in which he states that a review of a document

8   entitled "Life Final Action Sheet," the "underwriter approved the policy for insurance on

9   November 3rd, 1992 and assigned an effective or 'start date' of 10/27/92.  While the policy was

10  never actually delivered to the customer, there nevertheless was $180,000.00 life insurance

11  coverage in effect on the date Ms. Moyer was murdered."  (Pet.'s Ex. 50.)

12         In addition, in closing argument, defense counsel argued that the victim's test

13  results were not fully completed or sent to the underwriters by the date of her death.  (RT 2792.)

14  Defense counsel confirmed that the underwriter didn't even know the tests had been performed.

15  (RT 2792.)  These arguments were soundly based on the parties' stipulation that the insurance

16  policy was not issued until November 3, 1992.  (RT 1300.)  Given these arguments, it is unlikely

17  the admission of this work sheet would have made any difference on the jury's verdict.

18         Petitioner also faults defense counsel for failing to consult experts concerning

19  accident reconstruction and pathology.  Petitioner contends defense counsel was therefore not in

20  a position to dispute that the victim had been murdered.  However, petitioner has failed to

21  provide evidence that there was a basis for such a contention.  He has failed to provide any

22  evidence suggesting the pathologist's finding that the victim had been murdered by a take-down

23  strangle hold maneuver (RT 433-35; 522; 530-36) resulting in her broken neck was erroneous or

24  suggesting that the victim actually died in the auto accident as opposed to having her neck broken

25  in petitioner's entryway.

26  /////

1      Given the pathologist's testimony, it is unlikely defense counsel was in a position

2  to argue that the victim died in the auto accident as opposed to having been murdered whether or

3  not he consulted his own forensic expert.  Petitioner has failed to demonstrate that such argument

4  would have been viable given the evidence presented at trial.

5      Thus, petitioner has failed to demonstrate that the expert testimony provided at

6  trial was in error such that had defense counsel obtained an expert, it was probable a better

7  outcome would result.

8      However, at bottom, the expert testimony was a small part of the entire case.  The

9  focal point at petitioner's trial was who killed the victim:  petitioner or McLees or both?  This

10  case turned more on the credibility of witnesses and how all of their testimony fit together to

11  connect petitioner to the crime.  Indeed, the notes from the jury reflect at least some of their focus

12  was on this testimony, as they requested read-back of the following witnesses' testimony:  Ernest

13  Ross, Kenneth Keener, Monte Burtz, Bruce Ramirez and Carolyn Gallender.  (RT 2871-72.)

14      With regard to the receipt from the gas station, there is nothing on the face of the

15  gas station receipt to reflect the actual time the gas was purchased.  (Pet.'s Ex. 54.)  Even Mr.

16  Martin, the second year law student who assisted defense counsel at trial stated that "[a]pparently

17  Mr. Schenk felt that the evidence was contrived, and made a tactical decision not to use it."

18  (Pet.'s Ex. 41 at 2.)  Although petitioner faults defense counsel for failing to investigate this

19  receipt to determine whether it was contrived or not, petitioner has not provided a declaration

20  stating he was at the gas station at the time of the murder or a declaration from a service

21  attendant or other witness who could attest to his presence at the gas station at the time of the

22  victim's death.  Moreover, according to mapquest.com,[16] the gas station at 1020 Saratoga Way,

23  El Dorado Hills, California, is only 4.56 miles away from the Moyer home at 4591 Beechwood

24  Drive, El Dorado Hills, California.  Mapquest calculates the driving time to be 8 minutes.

25

26      [16] America Online, "Mapquest," (visited October 22, 2007) <http://www.mapquest.com>.

1    Petitioner has presented no evidence or argument to support a theory that the victim's time of

2    death was definitively established such that his presence at the gas station would have precluded

3    his culpability even if he could demonstrate he was at the gas station.  In addition, based on the

4    prosecution's theory that petitioner hired McLees to kill the victim, as supported by the testimony

5    of Ross and Fernandez, his presence at the gas station at the time of the murder would not prove

6    petitioner innocent in any event.

7           While defense counsel may have been going through difficult times during

8    petitioner's trial, especially toward the end of the trial, petitioner has not demonstrated that if he

9    had other, better-prepared, counsel, the outcome of this trial would have been different.

10          The Ninth Circuit Court of Appeals has reiterated that a state bar court's

11   subsequent finding of unfitness does not render an attorney's earlier assistance to a prisoner per

12   se ineffective.  Young v. Runnels, 435 F.3d 1038 (9th Cir. 2006).  The Young court pointed out

13   that the Ninth Circuit held that Strickland rather than Cronic applied even where the attorney

14   representing the defendant was disciplined mid-trial.  Young, 435 F.3d at 1043, citing United

15   States v. Mouzin, 785 F.2d 682, 696-98 (9th Cir. 1986).

16          While defense counsel apparently embezzled client funds from his client trust

17   account sometime between February 24, 1992 and February 21, 1995, defense counsel remained

18   in good standing with the State Bar while he represented petitioner.  Moreover, the thefts were

19   not discovered until June of 1995, long after the instant trial was over.  (Pet.'s Ex. 10.)  The

20   Young court noted that "if the discipline rendered is indicative of counsel's substandard abilities,

21   then that deficiency should be manifested in counsel's courtroom behavior and trial conduct."

22   Id., 435 F.3d at 1043.  As noted above, the court has reviewed the record and found no such

23   deficiency.  With benefit of hindsight, counsel could have done some things differently.  But on

24   this record, the court cannot find that it is probable the outcome would have been different had

25   counsel done any of the things suggested by petitioner.

26   /////

1    For all of the above reasons, petitioner's citation to the sleeping cases are

2 similarly unavailing. (Am. Pet. at 67-68.) The record does not reflect that petitioner's defense

3 counsel was so affected by his drinking that it rose to the level of sleeping during critical stages.

4 The trial judge, prosecutor and defense counsel's law clerk confirmed otherwise, as does a

5 review of the trial record.[17]

6    The state court's rejection of petitioner's second claim for relief was neither

7 contrary to, nor an unreasonable application of, controlling principles of United States Supreme

8 Court precedent. Petitioner's second claim for relief should be denied.

9    In light of the above, petitioner's motion for evidentiary hearing will be denied,

10 notwithstanding petitioner's citation to Stankewitz v. Woodford, 365 F.3d 706, 716 (9th Cir.

11 2004)(in death penalty case where AEDPA did not apply, defense counsel failed to investigate

12 and present mitigating evidence "vital evidence of Stankewitz's childhood of abuse, poverty and

13 institutionalization; his mental deficiencies amounting to borderline retardation; and his drug and

14 alcohol abuse exacerbating his disturbed emotional state, particularly in the days leading up to

15 the killing.") The Stankewitz court found that this undiscovered mitigating evidence "might well

16 have rebalanced the scale against death for some jurors." Id., 365 F.3d at 723.

17    Here, petitioner has failed to demonstrate that undiscovered evidence existed so

18 that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

19 proceeding would have been different. After review of the record, this court does not find

20 present "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S.

21 at 694. Accordingly, the motion for evidentiary hearing should be denied.

22    IT IS HEREBY ORDERED that petitioner's motion for evidentiary hearing is

23 denied.

24 /////

25

26   [17] The fact that defense counsel drank heavily during his representation of Manuel
Babbitt in the capital trial in the 1980s does not alter that analysis.

1        In accordance with the above, IT IS HEREBY RECOMMENDED that petitioner's

2  application for a writ of habeas corpus be denied.

3        These findings and recommendations are submitted to the United States District

4  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

5  after being served with these findings and recommendations, any party may file written

6  objections with the court and serve a copy on all parties.  Such a document should be captioned

7  "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

8  failure to file objections within the specified time may waive the right to appeal the District

9  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

10  DATED:  January 22, 2008.

11

12

13  UNITED STATES MAGISTRATE JUDGE

14  /001; moye1719.157

15

16

17

18

19

20

21

22

23

24

25

26